## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

### CASE NO.: 6:21-cv-01085-CEM-EJK

**MICHELIN D. MCKEE, as Personal Representative of the Estate of SALAYTHIS MELVIN, the Deceased,**

     **Plaintiff,**

**vs.**

**DEPUTY JAMES MONTIEL, in his individual Capacity and as an agent of ORANGE COUNTY SHERIFFS OFFICE et al,**

     **Defendants.**

_____/

### SHERIFF JOHN W. MINA's MOTION FOR RULE 11 SANCTIONS

Defendant John W. Mina in his official capacity as Sheriff of Orange County, Florida ("Sheriff Mina") by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 11(b) hereby moves for sanctions against Plaintiff's counsel.

### I.     INTRODUCTION

On February 24, 2022, Plaintiff's Counsel, Carlus Haynes filed an Amended Complaint asserting, among other claims, a single municipal liability claim (Count IX) against Sheriff Mina pursuant to 42 U.S.C. § 1983. [Doc. 46 ¶¶ 150-161]. Count

IX is titled "Deliberate Indifference in Training" and alleges that Sheriff Mina was deliberately indifferent to the need to train deputies in the following areas:

1. Conducting foot pursuits [Doc. 46 ¶ 153(a)];

2. Having supervisors in charge during the execution of warrants to coordinate, manage, and oversee pursuits. [Doc. 46 ¶ 153(b)];

3. Identifying and assessing a scene prior to making contact with a suspect [Doc. 46 ¶ 153(c)-(d)];

4. When not to pursue persons who are not criminal suspects and not posing a threat [Doc. 46 ¶ 153(e)];

5. Approaching a person that is not a suspect who is believed to be armed [Doc. 46 ¶ 153(f)];

6. Taking control of an arrest scene where one officer is supervising [Doc. 46 ¶ 153(g)];

7. The use of less lethal force [Doc. 46 ¶ 153(h)];

8. The use of lethal force [Doc. 46 ¶ 153(i)];

9. The use of de-escalation techniques before resorting to lethal force including identifying yourself if you are driving an undercover vehicle upon exiting [Doc. 46 ¶ 153(j)];

10. Preparation to discharge a firearm [Doc. 46 ¶ 153(k)];

11. Avoiding contagious fire [Doc. 46 ¶ 153(l)];

12. Providing medical assistance after the use of deadly force [Doc. 46 ¶ 153(m)]; and

13. The use of body worn cameras. [Doc. 46 ¶ 153(n)].

Plaintiff clarified in the response to Sheriff Mina's motion to dismiss that the failure to train claim is based solely on a failure to train "on proper use of force," [Doc. 46 at 34], including "methods to avoid the infliction of deadly force on a person who is not posing a threat." [Doc. 46 at 35]. Based on Plaintiff's clarification, the Court noted that "Plaintiff will be limited to this [use of force] theory of her claim proceeding forward in this litigation." [Doc. 61 p. 9, n. 3]. Accordingly, this motion is limited to the OCSO's training on the use of force.

## II.    LEGAL STANDARD OF RULE 11 SANCTIONS

"Federal Rule of Civil Procedure 11 authorizes a district court to impose sanctions against an attorney who files frivolous pleadings or motions." *Gulisano v. Burlington, Inc.*, 34 F.4th 935, 941 (11th Cir 2022) (citing Fed. R. Civ. P. 11(b), (c)). "Rule 11 sanctions are warranted when a party files a pleading or motion that (1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose." *Id.* at 941-42. (internal quotation marks omitted and citations omitted).

"Rule 11 imposes an affirmative duty on an attorney to conduct a reasonable inquiry into both the facts and the law before filing a pleading or motion." *Id.* at 942. "When deciding whether to impose sanctions under Rule 11, a district court must conduct a two-step inquiry, determining "(1) whether the party's claims are

objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Id.* "A factual claim is frivolous when it has no reasonable factual basis." *Id.* "A legal claim is frivolous when it has no reasonable chance of succeeding." *Id.*  "When the attorney's evidence is "merely weak," but supports a claim under existing law after a reasonable inquiry, sanctions are unwarranted." *Id.* "Sanctions are warranted, however, when the attorney exhibits "a deliberate indifference to obvious facts." *Id.*

"If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound." *Id.* "The reasonableness of the inquiry depends on the circumstances of the case." *Id.*

"In addition, an attorney's obligations with respect to the contents of pleadings or motions are not measured solely as of the time when the pleading or motion is initially filed with the court, but also at the time when the attorney, having learned the claims lack merit, reaffirms them to the court." *Id.* (citing *Turner v. Sungard Bus. Sys., Inc.*, 91 F.3d 1418, 1422 (11th Cir. 1996) (citing Fed. R. Civ. P. 11(b) advisory committee's note to 1993 amendment)). "That the contentions contained in the complaint were not frivolous at the time it was filed does not prevent the district court from sanctioning the attorney for his continued advocacy of them

after it should have been clear that those contentions were no longer tenable." *Id.* (bracketing omitted).

## III.   COUNT IX OF THE AMENDED COMPLAINT IS OBJECTIVELY FRIVOLOUS AND PLAINTIFF'S COUNSEL SHOULD HAVE BEEN AWARE OF THE CLAIM'S FRIVOLITY WHEN PRESENTED WITH THE EVIDENCE ACCOMPANYING THIS MOTION

### A. Legal Standard for Failure to Train Claim

A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S., at 665–683). Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S., at 691. "It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation. The "official policy or custom must be the moving force of the constitutional violation in order to establish liability of a government body under § 1983." *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 967 (11th Cir. 2002). "A plaintiff 'must demonstrate a direct causal link between the municipal

action and the deprivation of federal rights." *Id.* (citing *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). "[A] municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (bracketing in original) (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62. "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

### B. No Evidence of a Pattern of Similar Constitutional Violations by Untrained Deputies to Place Defendant on Notice

The Amended Complaint cites to two prior use of deadly force instances that purportedly establish a pattern of constitutional excessive force violations. Neither offer any support for the claim. The first is a January 2010 incident in which OCSO deputies used deadly force resulting in the death of Torey Breedlove. The Amended Complaint alleges that OCSO deputies chose, unnecessarily, to use deadly force to apprehend Mr. Breedlove. [Doc 46 ¶ 54(a)]. According to an OCSO internal investigation, Mr. Breedlove was attempting to escape arrest in a stolen truck when he rammed a police vehicle causing deputies to discharge their firearms. [Ex. A, Breedlove Professional Standards Report, p. 11]. After a thorough internal

investigation, all of the deputies who discharged their firearms were found to have done so upon a reasonable belief that the force was necessary to prevent imminent death or great bodily harm. [Ex. A, pp. 68-69]. The Florida State Attorney presented evidence of the circumstances surrounding Mr. Breedlove's death to a grand jury that returned a No True Bill and no criminal charges were pursued against any of the deputies who discharged their firearm. [Ex. B, Grand Jury No True Bill]. The federal civil rights lawsuit stemming from the incident, *Estate of Torey Breedlove v. OCSO* was dismissed with prejudice, [Ex. C, Breedlove Order of Dismissal], upon a settlement agreement and without any finding or admission of fault, liability, or constitutional violations. [Ex. D, Breedlove Joint Stipulation]. Thus, the Breedlove incident offers no support for Plaintiff's claim that Sheriff Mina was on notice that OCSO deputies were using excessive force on suspects. *See Simmons v. Bradshaw*, 879 F.3d 1157, 1168 (11th Cir. 2018) (affirming summary judgment on *Monell* claim and stating that "the district court noted correctly that "[s]ettlement agreements ... are not competent evidence that Sheriff Bradshaw condoned the actual use of excessive force."); *Buckler v. Israel*, 680 F. App'x 831, 836 (11th Cir. 2017) ("Those suits that were settled or voluntarily dismissed do not, without admissions of liability, put the [municipality] on notice of any pattern of constitutional violations."); *Isom v. Bulso*, No. 8:18-cv-2035, 2020 WL 6481113, at *10 (M.D. Fla.

Sept. 29, 2020) (settled lawsuits without any finding of liability do not provide notice of a pattern of constitutional violations).

The second incident relied upon by Plaintiff involved an OCSO deputy's use of deadly force in 2017 resulting in the death of Christopher Redding. The Amended Complaint alleges that Mr. Redding was shot twice in the back of the head by an OCSO deputy while detained and lying prone on the ground. [Doc 46 ¶ 54(a)]. According to court filings, in a subsequent civil suit, OCSO deputies were attempting to apprehend Mr. Redding in connection with a series of strong-arm robberies and burglaries. *Franklin v. Popovich*, 2022 WL 4464795, at *1 (M.D. Fla. Sept 26, 2022).[1] Mr. Redding engaged in a gunfight with the deputies, shot and wounded one of them, and then fled on foot. *Id.* at *2. Mr. Redding was shot several times and fell to the ground. *Id.* at *2. While Mr. Redding was partially restrained and lying prone on the ground, he made a sudden movement and reached under his body causing a deputy to shoot him resulting in his death. *Id.* at *3. The district granted qualified immunity and summary judgment to the deputy.[2] *Id.* at *10. Further, the State Attorney conducted an investigation into the shooting and

---

[1]Sheriff Mina requests that the Court take judicial notice of the summary judgment facts in *Franklin v. Popovich* referenced herein "for the limited purpose of recognizing ... the subject matter of the litigation." *Verizon Trademark Services, LLC v. Producers, Inc., Jones*, 2011 WL 308237 (M.D. Fla. Jan 27, 2011) (citing *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994)).

[2]The case is currently on appeal to the Eleventh Circuit.

concluded that the deputy's use of deadly force was in response to what the deputy reasonably believed to be a deadly threat. [Ex. E, Redding SAO Clearance Letter]. Thus, the Redding incident resulted in no finding of a constitutional violation and therefore provides no support for Plaintiff's claim that Sheriff Mina was on notice that OCSO deputies were using excessive force on suspects. *See Connick*, 563 U.S. at 62 ("A pattern of similar *constitutional violations* by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." (emphasis added).

Thus, the prior incidents cited by Plaintiff offer no support for her claim of a pattern of constitutional violations related to the use of deadly force within the OCSO, much less a pattern of constitutional violations similar to the one alleged in this case. Moreover, Plaintiff's counsel, upon receipt of the evidence accompanying this motion, is informed that there is no evidence indicating that Sheriff Mina knew that the OCSO's use of force training was deficient. *See Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir.1990) (holding that the plaintiff failed to prove failure to train claim in Section 1983 action because "the need for such training must be plainly obvious to" the final decision-makers and the district court had "found no evidence of a history of widespread prior abuse by Department personnel that would have put the sheriff on notice of the need for improved training or supervision"); *Popham v.*

*City of Talladega*, 908 F.2d 1561, 1564–65 (11th Cir.1990) (finding no liability for failure to train when no pattern of incidents put the city on notice of a need to train).

## C. The OCSO Has a Policy of Rigorously Training Officers on the Constitutional Limitations on the Use of Force Including Deadly Force

Even if it is assumed that the individual actions of Deputy Montiel occurring on August 7, 2020 violated Melvin's Fourth Amendment rights, there is no competent evidence that the OCSO as an agency was deliberately indifferent to a need to training sworn law enforcement personnel on the lawful and proper use of lethal force.

### i. The OCSO Use of Force Policy

At all times relevant to this action, use of force, including deadly force, by OCSO Deputies was governed by General Order 8.1.6 (Policy). [Ex. H, Use of Force Policy]. The overarching philosophy supporting the Use of Force Policy ("Policy") is that personnel use only that level of force that is objectively reasonable to perform law enforcement duties; and when deadly force is justified, it should be deployed as "a last resort." [Ex. H, p. 1]. The Policy requires deputies to consider several factors when making use of force decisions including but not limited to [1] apparent physical ability of subject, [2] number of subjects present who are involved, or who may become involved, [3] weapons possessed by or available to the subject, and [4] indicators of attack exhibited by the subject such as but not limited to

hostile/aggressive posturing. [Ex. H, p. 7]. The Policy authorizes deputies to discharge a firearm only:

> to defend themselves or other persons against unlawful force when they reasonably believe that such conduct is necessary to prevent imminent death or great bodily harm to themselves or others.

or

> When the deputy is able to independently, due to the totality of available information as well as experience based knowledge and training, articulate that the use of force is necessary to prevent imminent death or great bodily harm to themselves or others.

[Ex. H, p. 13]. The Policy expressly incorporates *Graham v. Connor*, 490 U.S. 386 (1989) and its multifactor factor analysis to determine whether use of force is constitutionally permitted. [Ex. H, p. 3]. The Policy has a use of force matrix[3] to be used as a guideline for deputies to select effective, reasonable, and legal force options in response to various levels of resistance being offered by a subject. [Ex. H, at pp. 3-7, 19-20; Ex. I, ¶ 5].

The Policy requires deputies to complete a Response to Resistance Report subsequent to certain specified use of force events. [Ex. H, p. 19 ("Use of Force Reporting Requirements")]. Response to Resistance Reports must be completed anytime chemical agents, electronic control devices, impact weapons, incapacitation, or deadly force of any kind is used. [Ex. I, Affidavit of Joseph

---

[3]The use of force matrix is a guideline to assist law enforcement officers when making decisions on how officer may respond to a subject's resistance while remaining compliant with constitutional requirements. [Ex. I, Affidavit of Joseph McCollom, ¶ 5].

McCollom, ¶ 10]. The Reports provide a detailed description of the force used and the circumstances surrounding the use of force. The OCSO Training Section reviews the Response to Resistance Reports on a continual basis to evaluate the need to augment use of force training. [Ex. I, ¶ 9]. Every deputy who is directly involved in a use of deadly force incident is required to attend post critical incident follow up training before resuming his or her law enforcement duties. The Training Section conducts an annual analysis to identify and recommend training needs, equipment upgrades, and/or modifications of the use of force policy. [Ex. I, ¶ 6].

### ii.   *The OCSO Use of Force Policy and Training Programs are Vetted and Accredited by Independent Third Parties*

At the time of this incident, the OCSO was accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA). [Ex. J, Accreditation Manager Farrell Affidavit, ¶ 5]. CALEA is an international organization designed to improve public safety services by maintaining a body of professional standards. [Ex. J, ¶ 6]. The CALEA Advanced Law Enforcement Program is specifically designed for elite law enforcement agencies that strive to demonstrate professional excellence within a comprehensive range of operational and administrative functional responsibilities. [Ex. J, ¶ 6]. In the four-year accreditation period between 2017 and 2020, CALEA conducted a comprehensive annual assessment of the OCSO covering a multitude of law enforcement standards including (1) Use of Authorized Less

Lethal Weapons, (2) Reporting Uses of Force, (3) Annual/Biennial Proficiency Training, (4) Use of Deadly Force, (5) Use of Reasonable Force, and (6) Use of Force Training & Firearms Proficiency  internal affairs, and complaint investigations [Ex. K, 2020 CALEA Accreditation Report, pp. 14, 19, 23].

As part of its accreditation process, CALEA reviewed the OCSO's (1) policy on the use of deadly force policy, (2) use of force training and firearm proficiency, and (3) constitutional requirements and verified that all were compliant with CALEA standards. [Ex. J, ¶ 7].

At the time of this incident, the OCSO was accredited by the Commission for Florida Law Accreditation, Inc. (CFA) an accreditation the OCSO has maintained since October 1996. [Ex. J, ¶ 8]. CFA is an independent reviewing authority that certifies that an agency has met specific law enforcement requirements and prescribed standards in the State of Florida. [Ex. J, ¶ 9]. The CFA accreditation process requires several in-person interviews and evaluations of the OCSO's myriad departments. [Ex. L, CFA Accreditation, pp. 4-13]. For the 2020-2022 accreditation period, the CFA assessment team found the OCSO to be in compliance with the use of force and training standards set by the CFA. [Ex. J, ¶ 11].

### iii.    The OCSO's Use of Force Training Program

The OCSO has pursued a policy and practice of providing newly sworn deputies with rigorous training on use of force that is annually updated and reinforced on an agency wide basis. Embedded in this training are de-escalation techniques used to lessen the threat and the corresponding need for force. This training includes critical incidents where the subject is reported to be armed with a weapon. [Ex. I, ¶ 7]. All prospective deputy recruits receive eighty hours of education in defensive tactics. [Ex. I, ¶ 10]. Recruits receive eighty hours of defensive tactics training that includes [1] how to apply the use of force matrix, [2] when it is appropriate to escalate the use of force, deescalate the use of force, and disengage. [Ex. I, ¶ 11]. Recruits are presented with dozens of training scenarios involving subjects presenting various threat levels and receive instruction on which level of response would be appropriate and constitutional under the circumstances. [Ex. I, ¶ 11]. Recruits are instructed on the various types of force options and which use of force options are considered deadly force and which are considered non-deadly force. [Ex. I, ¶ 11].

Recruits are trained how to assess known and rapidly evolving information to determine a subject's potential to cause harm to law enforcement and bystanders in a given environment and trained how to counter the perceived threat using an appropriate amount of force in accordance with the Response to Resistance Matrix. [Ex. I, ¶ 11]. Recruits are instructed to assess the threat potential posed by subjects and the minimum reactionary gap for individuals who are either armed or unarmed.

Recruits are also instructed on Florida law pertaining to an officer's use of force. [Ex. I, ¶ 11].

In the four years (2017-2020) leading up to this incident, all OCSO deputies were required to participate in annual use of force training. In 2017, sworn deputies where provided six hours of structured use of force training on the OCSO Use of Force policy and the Response to Resistance matrix which conformed to agency policy that deadly force should be considered as a last resort measure. [Ex. I, ¶ 12]. Deputies were instructed on the objective reasonableness standard in *Graham v. Connor* to be used as a guide in determining the proper use of force under Fourth Amendment. [Ex. I, ¶ 12]. The 2017 use of force training focused on improving the ability of OCSO deputies to assess threats in high-risk encounters with armed suspects and counter such threats with an appropriate level of force. [Ex. I, ¶ 12]. This training, known as Procedural Justice through Non-Biased Based Policing training and de-escalation training, consisted of several different role play simulations and reinforced police techniques (i.e., time, distance, cover, communication, less lethal weaponry, and back up), in situations where the suspect is engaged in various types of illegal activities (i.e., narcotics dealing, robbery, and active shooter) and is known to be armed and/or mentally unstable. [Ex. I, ¶ 12]. The simulations involve suspects presenting varying threat levels which require deputies to assess the threat and respond with the appropriate level of force including deadly force if the situation

16

warrants it. [Ex. I, ¶ 12]. Additionally, Deputies are instructed on post-shooting protocols including calling for emergency medical services and rendering first aid. [Ex. I, ¶ 12].

In 2018, sworn deputies where provided three hours of structured training including practical exercises on defensive tactics including techniques to avoid submission attempts by physically aggressive individuals. [Ex. I, ¶ 13]. Sworn deputies also conducted a practical foot pursuit drill in which they chased a simulated suspect on foot, un-holster an electronic control device ("ECD") (i.e., taser ), issued verbal commands, deploy the ECD against an advancing suspect, and finally handcuff the suspect. [Ex. I, ¶ 13].

In 2019, the year before this incident, sworn deputies were provided seven hours of structured training on the OCSO use of force policy, including the proper use of various deadly and non-deadly weapons. [Ex. I, ¶ 14]. Deputies engaged in live drills involving the use of non-deadly force options including the baton, electronic control device, and chemical agent. [Ex. I, ¶ 14]. The training included instruction on the OCSO Use of Force policy that included Use of Force training videos and a discussion on action vs. reaction timing which informs the judgment as to the deployment defensive police tools including firearms. [Ex. I, ¶ 14]. Deputies were again instructed on the *Graham v Connor* factors to determine the constitutionally

permissible use of force and acceptable circumstances for administering the use of non-deadly force. [Ex. I, ¶ 14].

In 2020, the year of this incident, sworn deputies were provided four hours of training on the use of ECDs and considerations in assessing the effectiveness of the device as well as the circumstances in which OCSO policy prohibits the use of the device. [Ex. I, ¶ 15]. This training focused on improving the ability of OCSO deputies to select the appropriate defensive weapon given the threat level encountered. [Ex. I, ¶ 15]. This lesson included a review of the OCSO Response to Resistance matrix incorporating agency philosophy that deadly force should be considered as a last resort measure and the *Graham v. Connor* factors (i.e., severity of crime, threat to safety of officer and others, and suspect's resistance to arrest and efforts to evade arrest) and practical training on use of less lethal weapons. [Ex. I, ¶ 15]. Additionally, in 2020, all sworn deputies were provided two hours of training that focused on de-escalation techniques during encounters with people suffering from a mental crisis and another two hours of training that focused on securing and rendering aid to individuals who have sustained gunshot wounds. [Ex. I, ¶ 16].

Thus, even if there were some evidence of a pattern establishing the need to train OCSO deputies on the use of deadly force, there is no evidence that Sheriff Mina ignored this need and "deliberate[ly] cho[se] not to take any action." *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("To establish a "deliberate or

conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."). Moreover, Plaintiff's counsel through discovery and defense disclosures in this action was informed that there is no evidence indicating that Sheriff Mina was deliberately indifferent to the need to train on the use of deadly force.

### iv.    *Deputy Montiel was Trained in Accordance with OCSO Requirements*

Deputy Montiel successfully completed the police academy training program in 2006. [Ex. I, ¶ 16]. Every year from 2006 to 2020, Deputy Montiel completed the Florida mandated firearms qualification. [Ex. I, ¶ 17]. Since his hire, Deputy Montiel received approximately 1,323 hours of training that included at least 76 hours of defensive tactics and use of force training incorporating agency philosophy that the amount of force used must be objectively reasonable and necessary to perform official duties; and when deadly force is considered it should be used only as a last resort. [Ex. I, ¶¶ 16-31].

### v.    *The OCSO's Professional Standards Section*

The OCSO's Professional Standards Section (PSS) is tasked with investigating internal and external allegations of inappropriate behavior,

misconduct, and agency policy violations by OCSO deputies.[4] [Ex. M, Segreaves Affidavit ¶ 8]. The OCSO encourages citizens to file complaints regarding the actions of deputies whenever there is a concern. [Ex. M, ¶ 7]. In addition all sworn and civilian personnel with the OCSO are obligated to report misconduct, including the use of excessive force. [Ex. M, ¶ 7]. Each complaint is investigated by PSS and concluded with a finding of Sustained, Not Sustained, Unfounded, or Exonerated as to a violation of OCSO policy or standards of conduct. [Ex. M, ¶ 8]. PSS is tasked with reviewing every Response to Resistance Report generated from a use of force event. [Ex. M, ¶ 5].

Since 1998 or 1999, the OCSO has implemented a computer based Early Identification System (EIS) to identify those deputies with a pattern of problematic performance, including use of force, and select those deputies to interventions designed to correct their performance. [Ex. M, ¶ 6]. The EIS program automatically identifies deputies who are involved in multiple use-of-force events, such as the discharge of a firearm or the deployment of an electronic control device (i.e., Taser) during any 12-month period. [Ex. M, ¶ 6]. When the EIS program identifies a deputy whose conduct falls within the reporting criteria status, the deputy's conduct is reviewed by a supervisor, the deputy is interviewed, and the deputy's chain of command confers to discuss the findings of the supervisor's review. [Ex. M, ¶ 6].

---

[4]PSS is analogous to the more commonly known term "Internal Affairs."

The chain of command may determine that intervention or corrective action is necessary and order counseling, reassignment, anger management, stress resolution, or remedial use of force training among other options.

All deputy involved shootings are investigated internally by PSS to determine whether any OCSO policies were violated in connection with the shooting. [Ex. M, ¶ 9]. PSS investigations of deputy involved shootings are conducted after the Florida Department of Law Enforcement (FDLE) has completed its investigation. [Ex. M, ¶ 9]. The OCSO collaborates with the FDLE to complete the investigations, providing whatever assistance and documentation is requested. [Ex. M, ¶ 9].

PSS's investigation includes a review of all evidence and statements contained within the FDLE report before a decision is made in regard to agency policy violations. [Ex. M, ¶ 10]. The OCSO conducts a thorough review known as Tactical Event Review Committee (TERC) every time a deputy uses deadly force. [Ex. M, ¶ 11]. The purpose of the TERC is to identify tactics, training, and policy deficiencies and make improvements. [Ex. M, ¶ 11].

## IV.   PLAINTIFF'S COUNSEL MADE NO EFFORT TO DISCOVER EVIDENCE TO PROVE COUNT IX

Rule 11 provides in part:

> By presenting to the court a pleading … by signing, filing, submitting, or later advocating it--an attorney … certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry

reasonable under the circumstances … *if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery*

Fed.R. Civ. P. 11(b)(3) (emphasis added).

In this case, the Complaint was filed on June 6, 2021. [Doc. 1]. On motion, the Court stayed the case to allow the Florida State Attorney to investigate the subject shooting. [Doc. 29]. Upon completion of that investigation the stay was lifted on February 10, 2022, [Doc. 44], and two days later on February 24, 2022, Plaintiff filed the Amended Complaint. [Doc. 46]. After an extension at Plaintiff's request [Doc. 76], discovery closed on November 2, 2023.

Since the filing of Amended Complaint, Plaintiff's counsel has had a reasonable opportunity to conduct discovery as to Count IX, and yet no such efforts were made. No requests for production were made to Sheriff Mina specific to Count IX. No interrogatories were directed to Sheriff Mina specific to Count IX. No requests for admissions were made to Sheriff Mina specific to Count IX. Plaintiff did not take a 30(b)(6) deposition to discover specifics about the OCSO's training program. Nor did Plaintiff depose anyone within the OCSO with knowledge of the agency's use of force training program. Thus, since the Case Management and Scheduling Order was entered March 28, 2022 [Doc. 56],  Plaintiff has done little to nothing to discover whether the accusations of OCSO indifference toward training were in any way supported by competent evidence. Please also disregarded

documentary and testimonial proof brought forward by the OCSO, at considerable expense, repudiating the accusations within Count IX and informing Plaintiff's counsel that the claim is frivolous.

## **CONCLUSION**

For the foregoing reasons, Sheriff Mina request that the Court enter an order finding that Plaintiff's counsel continued to maintain Count IX of the Amended Complaint after such time as Plaintiff's counsel took receipt of this motion and consequently knew or should have known that the claim was frivolous and maintained contrary to Fed. R. Civ. P. 11. Sheriff Mina also requests that the Court find that Sheriff Mina is entitled to cost, including reasonable attorney fees, incurred in defending against Count IX after this motion and accompanying evidence was served.

## **Fed. R. Civ. P 11 and Local Rule 3.01(g) Certification**

I certify that prior to service of this motion, counsel for Sheriff Mina had a telephone conversation with Plaintiff's counsel wherein counsel for Sheriff Mina expressed his intention to serve this motion and the general grounds for it. Plaintiff's counsel indicated that he intended to continue pursuing Count IX. I further certify that this motion was served on November 13, 2023 in accordance with Fed. R. Civ. P. 5 on Plaintiff's counsel via email after Plaintiff's counsel explicitly consented in

writing to the service of Rule 11 motions. As of December 4, 2023, the safe harbor period expired and the challenged claim was not withdrawn. Accordingly, this motion was filed.

s/Brian F. Moes
Brian F. Moes, Esquire

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 16, 2024, I electronically filed the foregoing with the Clerk of the Courts by using the CM/ECF system which will send a notice of electronic filing to:  Carlus L. Hayes, Esquire, Haynes Law , P.A., 8615 Commodity Circle, Unit 6, Orlando, FL 32819 (champ@fighting4ulaw.com, ebony@fighting4ulaw.com and paralegal@fighting4ulaw.com); Coretta Anthony-Smith (canthony@anthony-smithlaw.com) and Bruce R. Bogan, Esquire, Hilyard, Bogan & Palmer, PO Box 4973, Orlando, FL 32802-4973 (bbogan@hilyardlawfirm.com; mweiser@hilyardlawfirm.com and djadon@hilyardlawfirm.com).

/s/ Brian F. Moes
Brian F. Moes, Esquire
Florida Bar No. 39403
G. Ryan Dietrich, Esquire
Florida Bar No. 1007940
**Counsel for Defendant John Mina**
DeBevoise & Poulton, P.A.
1035 S. Semoran Blvd., Suite 1010
Winter Park, FL 32792
Telephone:  407-673-5000

24

Facsimile:    321-203-4304
Email:
Moes@DeBevoisePoulton.com
Dietrich@DeBevoisePoulton.com
Cook@DeBevoisePoulton.com
Rodriguez@DeBevoisePoulton.com